602

Osgood H. Dowell, of Chicago, Ill., for appellant.

Drury W. Cooper and C. Blake Townsend, both of New York City, and George A. Chritton, of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

On February 9, 1926, patent No. 1,572,-487, covering aluminum-copper alloy, was issued to appellee, the assignee of Zay Jeffries and Robert S. Archer, whose application was filed January 4, 1921, and on a division, the application for the patent in suit was filed April 29, 1924. The instant suit was brought against two defendants, the Acme Aluminum Foundry Company, an Illinois corporation, and the appellant herein, also an Illinois corporation. The decree sustained the patent, enjoined its further infringement, and directed the payment of damages which were fixed without any ac-

counting at $1,000 and costs of $1,500. The defendant, Acme Aluminum Foundry Company, accepted this decree and did not appeal.

Appellant denies validity of the patent and its infringement.

The patent relates to the art of making and heat-treating aluminum-copper alloy castings and it also covers the resultant—a heat-treated casting of aluminum-copper alloy. The three claims in suit are set forth in the margin.*

We quote from the specifications of the patent:

"The invention * * * relates to the production of aluminum alloy castings, particularly castings made of alloys containing silicon or copper or both, with or without other metals, and its chief object is to provide a simple and effective method which will produce light-weight castings with a hitherto unobtainable combination of physical properties, especially as regards elastic limit, tensile strength and ductility. * * *

"* * * the invention resides in the discovery that certain alloys are especially susceptible to improvement by heat treatment after casting, and that certain methods of casting such alloys further and peculiarly adapt them to such treatment; and in the additional discovery of temperature and duration of heat treatment in combinations appropriate to the particular alloys and methods of casting involved. With the aid of these discoveries we have been able to produce castings having improved physical properties with respect to elastic limit, tensile strength and ductility to an extent hitherto unattainable, with the result that it is now possible to use aluminum alloy castings for purposes for which their use has previously been impracticable. * * *

"The next step in the example of our process now being described consists in heating the castings to, and maintaining them at a temperature of 500° to 540° C. for a period of time depending upon the re-

---

* "1. In the art of making aluminum-alloy castings, the method comprising preparing an aluminum alloy containing between about 3 and 5.5 per cent. of copper, casting the alloy, heating the casting to a temperature of about 500° to 540° C. for at least about 7 hours, and cooling the casting.

"2. In the art of making aluminum-alloy castings, the method comprising preparing an aluminum alloy containing between about 3 and 5.5 per cent. of copper, casting the alloy, heating the casting to a temperature of about 500° to 540° C. for at least about 7 hours, and cooling the casting rapidly."

"14. As a new article of manufacture, a heat-treated casting of an aluminum alloy containing between about 3 and 5.5 per cent. of copper, characterized by the substantial absence of undissolved intergranular copper rich constituent, and having high tensile strength and elongation."

sults desired and the manner in which the casting was made. The principal object of heating the castings at the temperature mentioned is to cause the $CuAl_2$ in the net work to go into solution in the solid aluminum-rich constituent. It is found that at the temperatures referred to, this $CuAl_2$ dissolves slowly, in fact surprisingly slowly. In sand castings the time necessary for maximum solution of this $CuAl_2$ may be as much as 48 hours, at the temperatures mentioned; while in chill castings, because of the finer network structure, the time for maximum solution is less—for example, 7 hours has been found to be sufficient in some cases. * * *

"After the heating period the castings are preferably cooled rapidly, as by quenching in water. By the above described procedure, sand castings of an alloy containing 4 per cent copper, 0.2 per cent magnesium and less than .25 per cent iron have been produced with a tensile strength, after aging, of about 50,000 pounds per square inch and an elongation of 8.5 per cent. * * *"

The story of the development of the use of aluminum, made possible through the selection of various metals to be used in aluminum alloys and the application of heat to the alloys and later to the castings, is a fascinating tale of another triumph of the chemist in a new metallurgical field.

Whether Jeffries and Archer made an advance which justified the issuance of the patent in suit and whether appellant used their process, are the questions which we must answer differently from the District Court, or else affirm the decree.

Acme Aluminum Foundry Company procured or made castings of aluminum-copper alloy. It had these castings heat-treated by appellant. It then sold the finished product—the castings. In so heat-treating the castings furnished by Acme, did appellant infringe appellee's patented process or the patented product? If so, are the two process claims and the one product claim valid, in view of the existing state of the prior art? These are the questions which the instant appeal presents.

Several kinds of unpatented aluminum alloys are manufactured and sold on the market by different manufacturers. They have long been used. Concerning them and their use, there is little or no controversy. The patent before us deals with a heat-treating process of a casting made of this unpatented aluminum-copper alloy. The purpose of the treatment is to impart tensile strength to the product and retain other desirable qualities—ductility and lightness. The virtue of the process, i. e., its novelty and its claim to patentability, is to be found in the statement of percentages of copper used, the specifications of heating temperatures, and the specified length of time of the heating.

The chemists who applied for this patent sought to retain the strength and hardness of casting without too much loss of the ductility because of which aluminum is advantageously used. Likewise, they desired a casting which would avoid the weight of the harder metals as far as possible and at the same time secure greater tensile strength.

A short opinion in this case would hardly do justice to the exhaustive and instructive briefs which have been filed on both sides, or to the illuminating statements of the expert witnesses, Frary, Fink, and Norton, for the appellee, and the equally informative document issued by the Bureau of Standards (No. 337), prepared by Merica, Waltenberg, and Freeman, in 1919.

The members of the court are not chemists. The most we can be expected to do is to apply the usual qualification tests to the witnesses and make our deductions therefrom. Notwithstanding our lack of knowledge of chemistry, we have in this case more confidence than usual that the findings of the trial judge, as well as his conclusions, are well sustained by the evidence. The tests of patentability, which we discussed in an opinion just announced, Brown & Sharpe Co. v. Wahl, 85 F.(2d) 458, decided June 23, 1936, we have applied here.

We have been much impressed by the bulletin No. 337 of the Bureau of Standards, above referred to. We accept it as reliable. It has been, since its publication, a text book or handbook, to which chemists, working in this field, turn for reliable data and for general guidance. Every subsequent worker in the aluminum alloy field is no doubt indebted to these Government researchers who carefully and accurately recorded the results of their many and varied tests.

Likewise, it may be true that the bulletin furnishes the basis for all chemical studies in this field of aluminum alloys. We do not know. Yet for the sake of the argument it will be so assumed. Still, the conclusion is inescapable that the patent in suit was not anticipated by this article.

In short, we are not able to find in this bulletin the anticipation of the claim in question which appellant asserts for it. In the first place, Dr. Merica did not pretend to apply heat to castings to improve a casting. He dealt with the application of heat to aluminum-copper alloy, but nowhere was the second heating described. He excluded castings from the subject of his experimentation. In his statement in bulletin No. 347, issued in 1919 he gives one instance where the composition of the alloy was aluminum with 3 to 4.5 percent. copper. A very slight amount of magnesium and manganese was also specified. Speaking of it, however, he said: "It is used *only* in forged or rolled condition." Continuing, he said: "This alloy has been produced for some years commercially and is in demand for the fabrication of parts for which both lightness and strength are required such as for aircraft."

Regardless of any other question, it cannot be said that one who heat-treated aluminum-copper alloy for use in the forged or rolled condition, even though he used 3 to 4.5 percent. copper, necessarily anticipates one who uses the same percentage of copper in making a casting. It is also significant, as dealing with this same subject, that the product produced in Germany and known as duralumin was not used for castings. Wilm, whose patents are relied upon, did not claim that castings should be made by heating his duralumin. Likewise, directions for treating light metal duralumin and referring to German patent No. 244,544, published in August, 1918, stated:

"*Castings are not manufactured from duralumin* since in this form it offers no advantages as compared with other cheaper aluminum alloys."

The first difference, between the product of this patent and a product of the prior art is then an improved casting. But castings, of course, are old and known to the trade and even to laymen. It is not then the casting that is novel. It is a casting made of aluminum alloy, containing a low percentage of copper which is "characterized by the substantial absence of undissolved intergranular copper-rich constituent, and having high tensile strength and elongation" that is more highly useful and for which there was an insistent demand.

It was made possible by heating a casting as specified in the patent. The steps of the process taken as a whole were new and, unless Jeffries and Archer followed the teachings of prior patents and prior publications, their practices evidenced patentable novelty.

Examining the process claims one finds that the chemists have for the first time described the percentages of copper with a degree of specificity which is necessary before even those trained in the art can intelligently follow its teachings. For the most part, previous to this discovery, the percentage of copper used in making castings was greater than 3 to 5.5 percent. As a result the castings weighed more. Jeffries and Archer were seeking to lighten the weight of the castings because they were to be used extensively on flying machines, as well as on automobiles. Light castings were therefore the goal, and they therefore were required to use a low percentage of copper. To secure the other desired qualities, to-wit, high tensile strength and elongation, they made use of heat. It would not be teaching the art much to say "apply heat." That would be no more instructive than to say "Keep the percentage of copper low in your alloy" for copper is three times as heavy as aluminum. A process claim in this field must be more specific. To anticipate a process that produced a new or a better product, the prior art should teach the succeeding workers in the art how to proceed; otherwise it is not an anticipation. To tell a worker, even the most skilled, to heat the product is rather vague. "At what temperature?" the worker asks. "Oh, pretty high." "For how long shall heat be applied?" "Quite a while," replies the same oracle who advises the use of heat. To urge that such teachings may be followed by a research worker approaches the absurd.

To be of value (and of course exactness is not necessary in all cases, specificity being a relative term) the degree of temperature, as well as the length of time of the heat application, must be stated. Jeffries and Archer designated the heat as from 500 to 540 degrees. This alone might not have evidenced anything but experimentation. Others making tests had applied higher and lower temperatures and doubtless these degrees too. But, when to it is coupled the length of time, "at least about seven hours," we find a specific, definite teaching. Then was taught something to those working in this art.

However, this is not all that the patent teaches. Its process deals with a casting, and it calls for the *heating of a casting*. The steps of the process led to a result— an article made from an aluminum-copper

alloy, but wherein "undissolved inter-granular copper-rich constituent" is no longer present. It is the absence of this constituent in the alloy which gives to it tensile strength and elongation. The percentages of aluminum and copper in the alloy insure a light product.

The full strength of appellee's case is well stated in the following quotation from appellee's brief. We accept it as a concise and accurate statement of the art before and after the discovery of the patent.

"Prior to the invention of the patent in suit, no one had known or suggested that 'undissolved inter-granular copper-rich constituent' could be eliminated from an aluminum-copper alloy casting solely by heat-treatment. It had been supposed that heat-treatment for the purpose of dissolving the copper was effective *only* in the case of wrought material, in which the net-work of $CuAl_2$ had first been physically broken up and dispersed; and it was the general opinion of the leading authorities in the art that the 'Duralumin' type of alloy should *not* be used for *castings.*

"The patentees discovered that by a *very long* heat-treatment at a temperature below that at which any melting occurs (upwards of twenty hours in the case of defendant's castings, * * *), and so *much* longer than had ever been proposed or suggested before as to be different, not in degree but in *kind,* the network of 'undissolved inter-granular copper-rich constituent' ($CuAl_2$) can be broken up, and its copper put into solution in the aluminum *without the application of any mechanical means at all,* but solely by heat-treatment at the proper temperature, for a sufficiently long time. By such heat-treatment the $CuAl_2$, previously existing as a definite compound, is decomposed into its constituent elements, copper and aluminum, and thus destroyed. The resulting copper goes into solid solution in the mass of aluminum, and by an amazing process of diffusion of solid copper through solid aluminum, taking place *without any melting* of the alloy or either of its constituents, the copper becomes uniformly dissolved in and dispersed through the aluminum,—thus uniformly alloyed therewith. This alloying of copper with aluminum, in the solid casting, by a process of solid solution and diffusion, without any melting, produces what is now known as a 'strong alloy' of aluminum with copper, and the resulting casting has high 'tensile strength.' The elimination of the brittle and weak but hard $CuAl_2$ makes a casting of high ductility or 'elongation.'

"Thus the result of the heat-treatment described and claimed in the patent in suit is that there is produced, in a manner previously supposed to be absolutely impossible, and by prolonged heat-treatment alone, without any mechanical working or agency at all, an aluminum-copper alloy casting possessing a theretofore impossible combination of the two physical properties of 'high tensile strength and elongation,' and having the theretofore unattainable physical characteristic of being 'characterized by the substantial absence of undissolved inter-granular copper-rich constituent.' "

In our opinion, unless United States Bulletin No. 337 anticipated this, unless it taught Archer and Jeffries to do that which they have described in this patent, they are rightfully entitled to patent protection.

As to the teaching of the Government bulletin, from what has been said in this opinion, it is apparent that we cannot view it as an anticipation.

If the combination described in claim 14 were not an improved article, it would not be patentable. Its utility is, however, conclusively established by other evidence. The first year 31,000 pounds were produced; the next year 5,000,000 pounds. Thereafter, a large output was maintained by appellee, and an impressive array of licensees were also making large quantities of this same product and paying royalty to appellee.

Moreover, it is not likely that the same process would be followed by appellant if the product were not superior for certain uses than that which had been previously made.

We think it unnecessary to discuss other patent citations. The Claessen British patent and the two Wilm patents are discussed at length in the briefs. They spoke of heat, but they are far less pertinent as an anticipation than the U. S. Bulletin. We are convinced that if Jeffries and Archer made a patentable discovery in the face of the teaching of the U. S. Bulletin No. 337, it was not defeated by either Wilm patent or by the Claessen patent.

We might have rested the disposition of this case upon the findings of fact made by the District Court. We have, however, approached the case as an original question on the theory that the findings, in view of the Government bulletin, possibly presented a conclusion rather than a finding. Our

606

study has led us to the same conclusion (or finding) as was reached by the District Judge.

There were numerous defenses interposed by appellant in this case, and all of them were decided against it. Some of these defenses have been abandoned in this court. Others, such as prior use, are purely factual and the finding of the District Court is amply sustained by the evidence. One of these asserted prior use defenses—the one at Kenosha, Wisconsin—was not pressed in this court.

Infringement, we think, was established.

The decree is

'Affirmed.